13-1204-cv; 13-1207-cv; 13-1208-cv
In re AMR Corp.,

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2012

(Argued: June 20, 2013     Decided: September 12, 2013)

Docket Nos. 13-1204-cv, 13-1207-cv, 13-1208-cv

_____

IN RE: AMR CORPORATION ET AL.,
*Debtors,*

U.S. BANK TRUST NATIONAL ASSOCIATION, as Trustee and Security Agent under the Indenture and Aircraft Security Agreement for American Airlines 2009-2 Senior Secured Notes Due 2016, as Loan Trustee and Pass Through Trustee under those certain Indenture and Security Agreements with respect to the AMR 2009-1 EETC and AMR 2011-2 EETC Transactions,
*Appellant,*

-v.-

AMR CORPORATION, AMERICAN AIRLINES, INC.,
*Appellees.*

_____

Before: LIVINGSTON, LYNCH, and LOHIER, *Circuit Judges.*

U.S. Bank Trust National Association ("U.S. Bank") appeals from the decision of the United States Bankruptcy Court for the Southern District of New York (Lane, *B.J.*), authorizing Debtors AMR Corporation and American Airlines (collectively "Debtors" or "American") to obtain postpetition secured financing and to repay existing prepetition debt owed to U.S. Bank, and denying U.S. Bank's request for relief from the automatic stay. We granted U.S. Bank's petition for authorization of direct appeal under 28 U.S.C. § 158(d)(2)(A). On appeal, U.S. Bank argues that American is voluntarily attempting to repay the debt owed on its Notes and therefore must pay a

Make-Whole Amount under the terms of the Indentures and pursuant to its 11 U.S.C. § 1110(a) elections.   We disagree and therefore AFFIRM the bankruptcy court's order and judgments authorizing American to seek postpetition financing and to repay outstanding principal and interest (but no Make-Whole Amount) to U.S. Bank and declining to lift the automatic stay.

MICHAEL G. BURKE, Sidley Austin LLP, New York, NY (Nicholas K. Lagemann, Erica S. Malin, Andrew P. Propps, Sidley Austin LLP, New York, NY; Ira H. Goldman, Kathleen M. LaManna, Shipman & Goodwin LLP, Hartford, CT, *on the brief*) *for Appellant U.S. Bank Trust National Association, as Trustee and Security Agent under the Indenture and Aircraft Security Agreement for American Airlines 2009-2 Senior Secured Notes due 2016.*

FRANKLIN H. TOP, III, Chapman and Cutler LLP, Chicago, IL (Craig M. Price, Laura E. Appleby, Chapman and Cutler LLP, New York, NY; Ira H. Goldman, Kathleen M. LaManna, Shipman & Goodwin LLP, Hartford CT, *on the brief*) *for Appellant U.S. Bank Trust National Association, as Loan Trustee and Pass Through Trustee under those certain Indenture and Security Agreements with respect to the AMR 2009-1 EETC and AMR 2011-2 EETC Transactions.*

MICHAEL E. WILES, Debevoise & Plimpton LLP, New York, NY (Erica S. Weisgerber, Debevoise & Plimpton LLP, New York, NY; Stephen Karotkin, Alfredo R. Pérez, Weil, Gotshal & Manges LLP, New York, NY, *on the brief*) *for Appellees.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This case requires us to address two questions of law important to the workings of the Bankruptcy Code: (1) whether indenture clauses declaring a debtor's default upon the filing of a voluntary bankruptcy petition and providing for automatic debt acceleration are unenforceable *ipso facto* provisions[1] under § 365(e)(1) of the Bankruptcy Code, 11 U.S.C. § 365(e)(1), or other Code provisions cited by U.S. Bank; and (2) the requirements and consequences of an 11 U.S.C. § 1110(a) election when the only outstanding default is an *ipso facto* default that triggered automatic acceleration of the debt.

Appellant U.S. Bank National Trust Association ("U.S. Bank") appeals from an order entered February 1, 2013 and two judgments entered February 11, 2013 by the United States Bankruptcy Court for the Southern District of New York ("USBC-SDNY") (Lane, *B.J.*), which: (1) authorized AMR Corporation and American Airlines, Inc. (collectively "American" or "Debtors") to obtain postpetition financing; (2) authorized American to repay certain prepetition notes held by U.S. Bank and secured by aircraft; and (3) denied U.S. Bank's request to lift the automatic stay.  On February 28, 2013,

---

[1] "An *ipso facto* clause is a clause in a contract or lease that modif[ies] the relationship of contracting parties due to the filing of a bankruptcy petition." *In re AMR Corp.*, 485 B.R. 279, 296 (Bankr. S.D.N.Y. 2013) (alteration in original) (internal quotation marks omitted).

the bankruptcy court granted U.S. Bank's motion for direct appeal to our Court in light of the public importance of the matter and the lack of controlling Second Circuit law in relation to questions it presents; we granted U.S. Bank's petition for direct appeal on April 2, 2013.

We determine that: (1) per the language of the notes' Indenture Agreements (the "Indentures"), American's voluntary petition for bankruptcy triggered a default that accelerated the debt but required no Make-Whole Amount payment in connection with debt repayment; (2) the pertinent clauses, contained in nonexecutory contracts, are not within the scope of 11 U.S.C. § 365(e)(1) and are not rendered unenforceable by any other Bankruptcy Code provision identified by U.S. Bank; (3) American complied with its § 1110(a) elections to perform its obligations under the Indentures and cure any non-exempt defaults by making regularly scheduled principal and interest payments, and it was not required to cure its bankruptcy default; and (4) the bankruptcy court did not err in denying U.S. Bank's motion to lift the automatic stay.  Accordingly, we affirm the relevant order and judgments of the bankruptcy court.

## BACKGROUND

AMR Corporation, parent company to American Airlines, Inc., is an airline company with nearly 900 aircraft in operation serving customers in the United States and throughout the world. American commenced a voluntary bankruptcy on November 29, 2011, which is ongoing. This case concerns the impact of American's bankruptcy filing on certain notes held by U.S. Bank and secured by aircraft that American continues to operate as debtor-in-possession.

### I.

In order to finance a number of its aircraft, American entered into three separate transactions with U.S. Bank in 2009 and 2011. These transactions include the 2009-2 Secured Notes Financing ("2009-2 Note") issued by American in July 2009 and secured by a certain group of aircraft,[2] and two enhanced equipment trust certificate ("EETC") financings, issued by American in July 2009 ("2009-1 EETC") and October 2011 ("2011-2 EETC"), respectively, and secured by certain other groups of aircraft.[3] The 2009-2

---

[2] U.S. Bank serves as trustee and security agent for the Indenture and Security Agreement between American Airlines, Inc. and U.S. Bank on the 2009-2 Note, secured by twelve Boeing Aircraft.

[3] In equipment trust certificate transactions, "[a] trustee issues equipment trust certificates to investors, and uses the funds raised to buy the aircraft, which is then leased to the airline which ordered it." PETER S. MORELL, AIRLINE FINANCE 212 (3d ed. 2007). An enhanced equipment trust certificate divides the certificates issued to

Note has a maturity date of August 1, 2016; the 2009-1 EETC has a maturity date of July 2, 2019; and the 2011-2 EETC has a maturity date of October 15, 2021.

Each financing transaction includes an Indenture and Security Agreement made between American Airlines, Inc. and U.S. Bank in its capacity as Loan Trustee.[4]  The Indentures authorize the issuance of the Notes and assign rights to the aircraft as collateral for American's obligations.  The Indentures provide for regularly scheduled principal and interest payments until maturity; such payments are distributed according to a schedule in Section 3.01, "Basic Distributions."  However, the Indentures also provide for alternate payment distributions to the extent that certain delineated contingencies occur.  Accordingly, the Indentures indicate in Section 3.01, "[e]xcept as otherwise provided in Section 3.02, Section 3.03 and

---

investors into different categories based on risk, *see id.*, though the notes in question only involve one series of equipment notes and related class, *see* J.A. 82 n.1.  A single subordination agent holds the equipment notes on behalf of the pass-through trust, and the trustee administers the notes and issues them to the third-party investors.  J.A. 81-82.

For the 2009-1 EETC, U.S. Bank acts as successor loan trustee to over 20 separate Indenture and Security Agreements, each of which finances one Boeing airframe and two Rolls Royce or CFM International aircraft engines (collectively, "Aircraft").  For the 2011-2 EETC, U.S. Bank acts as the successor loan trustee pursuant to over 43 separate Indenture and Security Agreements, each of which finances an Aircraft.

[4] The three separate Indenture Agreements use similar language for the relevant contingencies and terms at issue; unless specified, we will collectively refer to the three separate indentures as the "Indentures" and cite to the 2011-2 EETC.

Section 3.04, each periodic payment by the Company of regularly scheduled installments of principal or interest on the Equipment Notes received by the Loan Trustee shall be promptly distributed in the following order of priority." J.A. 132.

Section 3.02 outlines the payment distribution when an Event of Loss (which triggers a mandatory redemption)[5] or a voluntary redemption occurs, "[e]xcept as otherwise provided in Sections 3.03 and 3.04."[6]  J.A. 133.  Section 3.02 specifically references Sections 2.10 and 2.11, which respectively define mandatory[7] and voluntary redemption.[8]   In the event of a voluntary

---

[5] "Event of Loss" is defined in Annex A of the Indentures, and principally covers damage to the aircraft, airframe, or engine, as well as possible takings or requisitions by governments for extended periods of time.   Section 2.10 provides that Events of Loss trigger mandatory redemption, *see* J.A. 125 ("The Company *shall* redeem the Equipment Notes in whole in connection with an Event of Loss.") (emphasis added).

[6] Section 3.03 is discussed *infra*.   Section 3.04, "Certain Payments," concerns payments received by the Trustee outside of the normal principal and interest payments provided for in Section 3.01, or any payment schedule triggered by mandatory redemption, voluntary redemption, or Events of Default.  *See* J.A. 140. It is not applicable to the present appeal.

[7] Section 2.10 provides that mandatory redemption occurs upon an Event of Loss and requires American to redeem the Equipment Notes in whole "at a redemption price equal to 100% of the unpaid principal amount thereof, together with all accrued and unpaid interest thereon to (but excluding) the date of redemption, *but without any Make-Whole Amount*."  J.A. 125 (emphasis added).  In the 2009-2 Note, the mandatory redemption provision provides for different redemption scenarios apart from the Event of Loss described in the EETC transactions, but these differences are not at issue in the instant case.  *See* J.A. 898-900.

[8] Section 2.11 provides that American can voluntarily redeem the Equipment Notes

7

redemption *but not* in the event of a mandatory redemption, a Make-Whole Amount may be required. The "Make-Whole Amount," due if the airline voluntarily redeems the notes prior to the maturity date, is the present value of the remaining scheduled payments of principal and interest to maturity using a discount rate linked to the Treasury Yield.

Section 3.03 outlines payments to be made "after both an Event of Default shall have occurred and be continuing *and* the Equipment Notes shall have become due and payable pursuant to Section 4.02(a)."[9] J.A. 135 (emphasis added). While the Indentures distinguish between voluntary and mandatory redemptions as to the debtor's obligation to pay a Make-Whole Amount, Section 3.03 expressly provides, regarding continuing Events of Default in the context of accelerated debt, that "[n]o Make-Whole Amount

---

> at any time upon at least 15 days' revocable prior written notice to the Loan Trustee and the Noteholders, and such Equipment Notes shall be redeemed in whole at a redemption price equal to 100% of the unpaid principal amount thereof, together with accrued and unpaid interest thereon to (but excluding) the date of redemption and all other Secured Obligations owed or then due and payable to the Noteholders, plus Make-Whole Amount, if any . . . .

J.A. 126. In the 2009-2 Note, voluntary redemption is listed under Section 2.20. The only notable difference between the two sections relates to their notice provisions, which are not material to the case at hand. *See* J.A. 900.

[9] Section 4.02(a) is discussed *infra*, but it broadly addresses circumstances in which the debt owed by American is accelerated, either upon action by the Loan Trustee in specified circumstances or automatically, upon the occurrence of certain bankruptcy-related Events of Default.

shall be payable on the Equipment Notes as a consequence of or in connection with an Event of Default or the acceleration of the Equipment Notes." J.A. 140.

Article IV of the Indentures defines the Events of Default referred to in Section 3.03. There are ten Events of Default listed in Section 4.01, including, *inter alia*, failure to make payment, failure to maintain insurance, failure to abide by various covenants or conditions, and material misrepresentations in operative documents. Section 4.01(g) identifies filing a voluntary petition in bankruptcy or a voluntary petition "seeking reorganization, liquidation or other relief as a debtor" as an Event of Default.

After delineating Events of Default in Section 4.01, Section 4.02 of the Indentures outlines remedies that the Loan Trustee "*may*, and upon the written instruction of a Majority in Interest of Noteholders . . . *shall*" pursue after an Event of Default occurs and continues. J.A. 144 (emphases added). Section 4.02(a)(i) provides that upon an Event of Default, the Loan Trustee *may* declare the Equipment Notes due and payable (accelerating the maturity date); however, Section 4.02(a)(i) then specifies:

> provided that if an Event of Default referred to in Section 4.01(f), Section 4.01(g), Section 4.01(h) or Section 4.01(i) shall have occurred and be continuing, *then and in every such case* the unpaid principal amount of the Equipment Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the avoidance of

doubt, without Make-Whole Amount), *shall immediately and without further act become due and payable* without presentment, demand, protest or notice, all of which are hereby waived.

J.A. 145 (emphases added). Section 4.02(a)(ii) elaborates the three remedies the Loan Trustee may pursue after the Loan Trustee declares the notes due and payable or after the debt is automatically accelerated by operation of Section 4.02(a)(i): (1) delivery of the equipment; (2) sale of the equipment; or (3) "any other remedy of a secured party under the Uniform Commercial Code of the State of New York." If American defaults, the default continues, *and* the debt is accelerated, "all payments received and amounts held or realized by the Loan Trustee" are to be distributed according to the order of priority specified in Section 3.03. *See* Section 3.03.

## II.

On November 29, 2011, American filed a voluntary petition for bankruptcy. On December 23, 2011, the bankruptcy court entered an order authorizing Debtors to (1) enter into agreements under 11 U.S.C. § 1110(a) of the Bankruptcy Code (hereinafter "§ 1110(a) elections" or "§ 1110(a) agreement"); (2) enter into stipulations to extend the time to comply with § 1110; and (3) file redacted § 1110 stipulations.[10] American thereafter

---

[10] Section 1110(a), to be further discussed *infra*, is a provision of the Bankruptcy Code granting secured parties with a security interest in aircraft or related equipment the power to possess the collateral "in compliance with a security agreement, lease, or conditional sale contract" and to enforce other rights

committed in December 2011 and January 2012 § 1110(a) elections "to perform all obligations of the Debtors under the [Indentures] with respect to the Aircraft Equipment" and to cure any default "other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code." J.A. 68. Each election also confirmed that it did not constitute an assumption of the underlying financing agreements, and that it was freely revocable.

American thereafter made regularly scheduled payments of principal and interest on February 1, 2012 and August 1, 2012. U.S. Bank did not object in February or August 2012 that the amount paid by American was insufficient. As of September 30, 2012, American was indebted in the principal amounts of $445,618,425 for the 2009-1 EETC, $174,163,156 for the 2009-2 Note, and $703,645,330 for the 2011-2 EETC.

On October 9, 2012, Debtors filed a motion for authorization under 11 U.S.C. § 364(c) to obtain postpetition financing in the amount of $1.5 billion, citing low interest rates available in the market. Debtors also requested

---

notwithstanding application of the automatic stay under 11 U.S.C. § 362 or other Bankruptcy Code provisions. 11 U.S.C. § 1110(a)(1). In the event that the debtor satisfies the conditions of § 1110(a)(2) – agreeing to perform obligations under its agreement with the secured creditor and curing any default not specified in 11 U.S.C. § 365(b)(2) – within a designated timeframe, however, the debtor effectively makes a § 1110(a) "election" and thereby receives protection under the automatic stay so long as it continues to comply with its election. *See, e.g.*, *In re Trans World Airlines, Inc.*, 145 F.3d 124, 137 (3d Cir. 1998) ("If a § 1110 agreement is executed, which requires court approval but not the lessor's consent, the automatic stay remains in effect.").

authorization to use the new financing to "repay certain existing prepetition obligations secured by the Aircraft, including obligations under the Prepetition Notes . . . without the payment of any Make-Whole Amount" pursuant to 11 U.S.C. § 363(b). *See* J.A. 79. U.S. Bank filed objections on October 23, 2012 as both Loan Trustee for the EETC Transactions and as Trustee and Security Agent for the 2009-2 Note,[11] arguing that: 1) American could only "voluntarily" redeem the notes by paying all secured obligations, including the Make-Whole Amount; (2) the Make-Whole provisions are enforceable under applicable law; (3) filing for bankruptcy did not automatically accelerate the debt and any clauses that so dictated were unenforceable *ipso facto* clauses; (4) if the debt was accelerated under a bankruptcy event of default, U.S. Bank should be allowed to waive the default and decelerate the debt; and (5) the § 1110(a) election and regular principal and interest payments made in February and August 2012 prevent Debtors from now attempting to repay a "default" without any Make-Whole Amount. U.S. Bank filed complaints for declaratory relief on November 7

---

[11] U.S. Bank made separate objections for the EETC Transactions and the 2009-2 Note throughout the proceedings below, yet the bankruptcy court consolidated these objections in its Memorandum Opinion and accompanying order and judgments. On appeal, U.S. Bank again filed two appellant briefs and replies. As U.S. Bank's arguments in these two sets of briefs are virtually the same, the legal issues are equivalent, and the relevant indenture language differs in only immaterial respects, we adopt the bankruptcy court's approach and refer to the separately briefed arguments as one U.S. Bank argument.

and November 16, 2012, and argued, in addition, that assuming the debt was accelerated, American had not complied with its § 1110(a) elections by not paying the full accelerated amount.  In its complaints for declaratory relief, U.S. Bank requested that the court declare that American must pay the Make-Whole Amount in accordance with the Indentures' voluntary redemption provisions to the extent American obtains new financing and attempts to repay the notes.  U.S. Bank also requested that the bankruptcy court lift the automatic stay to the extent necessary for U.S. Bank to waive the alleged default and annul any acceleration.[12]

The bankruptcy court issued a decision on January 17, 2013, an order on February 1, 2013, and judgments on February 11, 2013, granting American's motion to secure financing and to repay its obligations, and denying U.S. Bank's request to lift the automatic stay.  In its decision, the court principally addressed U.S. Bank's request that the court declare the legal rights of the parties under the Indentures pursuant to the Declaratory Judgment Act.  *See In re AMR Corp.*, 485 B.R. 279 (Bankr. S.D.N.Y. 2013). The court concluded that the Indentures clearly state that American's bankruptcy filing was an Event of Default that automatically accelerated the

---

[12] U.S. Bank filed a motion before the Bankruptcy Court seeking limited relief from the automatic stay on December 6, 2012.

debt and that in such circumstances American does not owe any Make-Whole Amount in connection with repayment of the accelerated debt still owed.

Addressing U.S. Bank's arguments, the court first disagreed with the contention that acceleration is a remedy to be invoked by the Loan Trustee and that, because the Loan Trustee here never elected such a remedy, the debt was not accelerated. The court concluded that the Indentures clearly and specifically provide for automatic acceleration upon a bankruptcy-related default and that this contractual provision is not in conflict with case law cited by U.S. Bank. *Id.* at 290-93. The court also concluded that the automatic stay bars U.S. Bank from waiving the Event of Default and decelerating the debt, and that lifting the stay in order to permit U.S. Bank to do so was not appropriate. *Id.* at 293-96. As to U.S. Bank's argument that Section 4.02(a)(i) is an *ipso facto* clause unenforceable under 11 U.S.C. § 365(e)(1), the bankruptcy court disagreed, concluding that § 365(e)(1) pertains only to *ipso facto* clauses in executory contracts and unexpired leases. *Id.* at 296-98.

The bankruptcy court next addressed U.S. Bank's argument that American is attempting voluntarily to redeem the notes under Section 2.11(a) of the Indentures and that, in this circumstance, a Make-Whole Amount is due. In light of its conclusion that filing for bankruptcy automatically

14

accelerated the debt and that the Indentures distinguish between voluntary prepayment and payments due upon automatic acceleration, the court rejected U.S. Bank's argument. *Id.* at 298-99. The court noted that case law from the Southern District of New York and USBC-SDNY supports the conclusion that a payment of debt due upon acceleration is different from voluntary redemption, and the isolated parts of the Indentures cited by U.S. Bank – such as the "Make-Whole Amount" definition and phrases concerning voluntary redemption – neither undercut the relevance of these cases nor point to a contrary interpretation of these Indentures. *Id.* at 299-304 (citing *HSBC Bank USA, Nat'l Ass'n v. Calpine Corp.*, No. 07-cv-3088, 2010 WL 3835200 (S.D.N.Y. Sep. 15, 2010); *In re Solutia Inc.*, 379 B.R. 473 (Bankr. S.D.N.Y. 2007)).

Finally, the bankruptcy court examined 11 U.S.C. § 1110 and American's § 1110(a) elections and concluded that the default at issue is a bankruptcy default that American was not required to cure under § 1110(a)(2)(B). American therefore complied with the conditions of its § 1110(a) elections by performing its contractual obligations to make regularly scheduled principal and interest payments. *Id.* at 304-06. The court also concluded that American's performance in making regularly scheduled payments did not estop American from subsequently paying the

accelerated debt due (but protected from collection by the automatic stay), and it observed that § 1110(a) elections do not constitute permanent commitments to bind the debtor to their terms. *Id.* at 306-07. As the court explained, the source of U.S. Bank's unhappiness lies in the language of 11 U.S.C. § 1110 and the terms of the Indentures, both of which permit American, in the circumstances here, to make principal and interest payments during bankruptcy proceedings and then subsequently to repay the accelerated debt without the Make-Whole Amount. *Id.* at 307-09.

Accordingly, the court approved American's motion for new financing under 11 U.S.C. § 364(c), concluding that the relief sought by American was an appropriate exercise of the Debtors' business judgment, and that the Debtors had sound business reasons for moving to repay obligations under 11 U.S.C. § 363(b). It authorized the postpetition financing and repayment of financing transactions in its February 1, 2013 orders. On February 28, 2013, the bankruptcy court granted U.S. Bank's motion for certification for direct appeal to this Court pursuant to 28 U.S.C. § 158(d)(2), stating that the appeals present questions of law for which there is no controlling decision of the Second Circuit and involve matters of public importance. U.S. Bank then petitioned this Court to allow direct appeal of the bankruptcy court's order

and judgments, and a different Panel of this Court granted that motion on April 2, 2013. This appeal followed.

## DISCUSSION

We have jurisdiction over this appeal certified from the bankruptcy court and accepted by this Court pursuant to 28 U.S.C. § 158(d)(2), and we "review the legal conclusions of the bankruptcy court . . . *de novo*." *In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 234 (2d Cir. 2011). Our review of a bankruptcy court's denial of relief from the automatic stay is for abuse of discretion. *See In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 91 (2d Cir. 2003).

On appeal, U.S. Bank reiterates the arguments advanced in the bankruptcy court. Principally, it asserts that American's proposed debt payment is properly construed as a voluntary prepayment under the Indentures and thus requires payment of the Make-Whole Amount. U.S. Bank contends that although an Event of Default occurred when American filed for bankruptcy in November 2011, U.S. Bank did not elect to accelerate the debt as a remedy, and therefore – in accordance with the Debtors' § 1110(a) elections and regularly scheduled payments of principal and interest – American is now trying to prepay without satisfying the contractual obligation of the Make-Whole Amount. U.S. Bank also maintains

17

that to the extent acceleration occurred automatically under Indenture provisions by virtue of American's bankruptcy filing, such provisions are unenforceable *ipso facto* clauses. Alternatively, U.S. Bank proposes that to the extent the Notes were accelerated, the § 1110(a) election decelerated them, as confirmed by American's payment of regularly scheduled principal and interest. Finally, U.S. Bank contends that it should be permitted to rescind any such acceleration or waive the Event of Default because such a rescission does not violate the automatic stay but merely enforces contractual rights and rights under § 1110.

## I. Indentures

We begin with the text of the Indentures, which we interpret applying basic contract law. *Jamie Secs. Co. v. The Ltd. Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989) ("It is a well-established rule in this Circuit that the '[i]nterpretation of [I]ndenture provisions is a matter of basic contract law.'" (quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982)) (alterations in *Jamie*)). New York law governs the interpretation of these Indentures, and courts applying New York law construe a contract "so as to give full meaning and effect to all of its provisions." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (quoting *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (1st

Dep't 1990)); *see also Consedine v. Portville Cent. Sch. Dist.*, 907 N.E.2d 684, 689 (N.Y. 2009) (instructing courts to read contracts as a whole and not place "undue emphasis" upon particular words or phrases). "[W]hen parties set down their agreement in a clear, complete document," the New York Court of Appeals has said, "their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Whether a contract is ambiguous is a question of law for the courts to resolve. *Id.*; *see also S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005) ("Whether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous.").

A. *American's Voluntary Petition Triggered a Default Under the Indentures that Accelerated the Debt but Excluded Make-Whole Amount*

Reading the Indentures *de novo*, we agree with the bankruptcy court that American's voluntary petition for bankruptcy was an Event of Default under Section 4.01(g) of the Indentures. Section 4.01(g) expressly defines filing a "voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization, liquidation or other relief as a debtor in a case under any bankruptcy laws or insolvency laws" as an Event of Default.

19

J.A. 143.   We also agree that American's bankruptcy filing triggered the automatic acceleration of its debt.   For non-bankruptcy Events of Default under the Indentures, Section 4.02(a) states that the Trustee "*may*, and upon the written instructions of a Majority in Interest of Noteholders, . . . *shall*" "declare by written notice to [American] all the Equipment Notes to be due and payable . . . ."   J.A. 144-45 (emphases added).[13]   Thus, as to non-bankruptcy Events of Default, the Trustee has the *option* to invoke acceleration as a remedy.   This is not the case, however, with regard to the voluntary filing of a bankruptcy petition, defined as an Event of Default in Section 4.01(g).   For after setting forth the general rule, Section 4.02(a)(i) expressly states:

> *provided* that if an Event of Default referred to in . . . Section 4.01(g) . . . shall have occurred and be continuing, *then and in every such case* the unpaid principal amount of the Equipment Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the avoidance of doubt, without Make-Whole Amount), *shall immediately and without further act become due and payable* without presentment, demand, protest or notice, all of which are hereby waived.

---

[13] Declaring a note due and payable is accelerating the debt.  *See Black's Law Dictionary* 12 (9th ed. 2009) (defining acceleration as "the advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately").  Acceleration "changes the date of maturity from some point in the future . . . to an earlier date based on the debtor's default under the contract."  *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 44 (2d Cir. 2012) (quoting *NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 491 (N.Y. 2011)).

J.A. 145 (emphases added).  Under New York law, "a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision." *Capital Ventures Int'l v. Republic of Argentina*, 652 F.3d 266, 271 (2d Cir. 2011) (citing *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956)).  Generally, when Events of Default occur, the Loan Trustee, acting for noteholders, can elect to declare debts due, pursue other remedies, or let a default go unremedied.  But, as made plain in Section 4.02(a)(i), the debt was automatically accelerated by American's bankruptcy filing.[14]

We also agree with the bankruptcy court that in this circumstance – where a Section 4.01(g) Event of Default has occurred resulting in the automatic acceleration of the debt – the Indentures provide that no Make-Whole Amount is due.  American's November 29, 2011 bankruptcy filing triggered an Event of Default (Section 4.01(g)), which automatically accelerated the debt under Section 4.02(a)(i).  And Section 4.02(a)(i) expressly provides that this accelerated debt – "the unpaid principal amount of the Equipment Notes then outstanding, together with accrued but unpaid

---

[14] The bankruptcy court also posited that regardless of the language in the Indentures, the debt is automatically accelerated by operation of law when the debtor files a voluntary bankruptcy petition.  *See In re AMR Corp.*, 485 B.R. at 290 n.7.  We agree with the bankruptcy court's subsequent statement that we "do[] not need to look beyond the controlling language of the operative contract," *id.*, and so we do not reach this ground for the bankruptcy court's conclusion.

interest thereon and all other amounts due" – is "*without Make-Whole Amount*" (emphasis added).  Section 3.03, governing payments to be made by American after an Event of Default "shall have occurred and be continuing and the Equipment Notes shall have become due and payable pursuant to Section 4.02(a)," confirms this, explicitly providing that "[n]o Make-Whole Amount shall be payable . . . as a consequence of or in connection with an Event of Default or the acceleration of the Equipment Notes."  J.A. 140.  Prior to October 2012 (and consistent with American's position that it properly made and abided by § 1110(a) elections, entitling it to the benefit of the automatic stay) American made no attempt to pay the outstanding accelerated debt.  But this delay in no way changes the status of the parties vis-à-vis the Indentures as of November 29, 2011: American owed and continues to owe the outstanding principal and any unpaid interest on the accelerated debt, but no Make-Whole Amount.

B.    *U.S. Bank's Arguments Fail to Refute this Plain Language Interpretation of the Indentures*

U.S. Bank makes three arguments in an effort to refute the plain language of the Indentures.  First, U.S. Bank argues that the Trustee never elected to accelerate the debt, and that such action by the Trustee is required under New York law.  Second, U.S. Bank asserts that even if acceleration took place, U.S. Bank can rescind this acceleration, obliging American to pay

a Make-Whole Amount in connection with its refinancing, and that the bankruptcy court erred in concluding that such rescission is barred by the automatic stay.    Finally, U.S. Bank argues that regardless whether American's debt was accelerated at the time it filed for bankruptcy, American's attempt to capitalize on favorable market conditions by paying off the debt nearly one year later, properly understood, is a voluntary redemption pursuant to Section 2.11, requiring payment of a Make-Whole Amount.  We discuss each argument in turn.

### 1.    *Automatic Acceleration Versus Trustee Election*

U.S. Bank first argues that despite the plain language of the Indentures, "[u]nder New York law, acceleration is a remedy that affirmatively must be chosen by lenders and cannot be invoked by borrowers."  U.S. Bank relies principally on two cases: *Wurzler v. Clifford*, 36 N.Y.S.2d 516 (N.Y. Sup. Ct. 1942), and *Tymon v. Wolitzer*, 240 N.Y.S.2d 888 (N.Y. Sup. Ct. 1963).  Like the bankruptcy court, we are unpersuaded.

As the bankruptcy court noted, both *Wurzler* and *Tymon* deal with "bare bones acceleration clauses," which provide that any default operates so as to make obligations due and payable without specification as to whether any action or notice on the part of the non-defaulting creditor is required.  *In re AMR Corp.*, 485 B.R. at 291.  The *Wurzler* and *Tymon* courts interpreted

23

the clauses at issue in those cases as "not self-operative," intended simply to give the creditor "the right to treat the entire debt as matured." *Wurzler*, 36 N.Y.S.2d at 517. But as subsequent courts have recognized, these cases "did not foreclose the ability of parties to draft acceleration provisions that would be self-operative." *See In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 627 (Bankr. S.D. Miss. 2010) (distinguishing *Tymon* as establishing a rule for similar acceleration clauses but not foreclosing the availability of self-executing acceleration clauses). Indeed, no court applying New York law since *Tymon* has cited the holdings of *Wurzler* or *Tymon* as a basis for declining to enforce an automatic acceleration provision, and certainly not one of the sort here: contained in an agreement that specifically differentiates between those Events of Default pursuant to which the Loan Trustee *may* declare the Equipment Notes due and payable and those Events of Default pursuant to which the Notes "shall immediately and without further act become due and payable without presentment, demand, protest or notice." J.A. 145.

To the contrary, as we recognized in *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 44 (2d Cir. 2012), "under New York law, '[t]he parties to a loan agreement are free to include provisions directing what will happen in the event of default . . . of the debt, supplying specific terms that

24

super[s]ede other provisions in the contract if those events occur." (quoting *NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 491 (N.Y. 2011) (alterations in *Analytical Surveys*)).   And numerous courts applying New York law have enforced automatic acceleration provisions.  *See Calpine Corp.*, 2010 WL 3835200, at *3 (enforcing a clause automatically accelerating debt upon a voluntary bankruptcy filing); *In re Solutia Inc.*, 379 B.R. at 484 (noting that "[i]t was entirely appropriate to provide for automatic acceleration in the Original Indenture since the giving of a notice of acceleration post-petition would violate the automatic stay").  As the New York Court of Appeals has stated, "[i]n rare cases, agreements providing for the acceleration of the entire debt upon the default of the obligor may be circumscribed or denied enforcement by utilization of equitable principles.  In the vast majority of instances, however, these clauses have been enforced at law in accordance with their terms." *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 389 N.E.2d 113, 116 (N.Y. 1979); *see also Key Int'l Mfg. Inc. v. Stillman*, 480 N.Y.S.2d 528, 530 (2d Dep't 1984) ("Acceleration clauses are quite common and are generally enforced according to their terms.  It is only in rare cases that clauses will be denied enforcement under equitable principles." (internal quotation marks and citations omitted)).

U.S. Bank suggests that automatic acceleration provisions of the sort here benefit lenders and that permitting American "to use Section 4.02 as a sword" is inequitable, presenting the sort of "rare circumstance" in which New York courts hold enforcement is properly refused.  We disagree.  Even were we (unwisely) to disregard the "sensible proposition of law" that contracts are to be enforced pursuant to their clear and unambiguous terms, *see Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995) (internal quotation marks omitted), the automatic acceleration provision here is not solely for the benefit of one party, but simultaneously affords potential benefits to both: it accelerates the amount presently due for the purpose of the noteholders' claims against American in bankruptcy and it excludes any Make-Whole Amount from American's obligations, to American's benefit. U.S. Bank is due the outstanding principal and any applicable interest payments when American repays its debts, but "there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties" in the circumstances here.  *Fifty States Mgmt. Corp.*, 389 N.E.2d at 116; *see also In re Solutia Inc.*, 379 B.R. at 484 (noting that the automatic acceleration provision in a note indenture was "the result that [noteholders] bargained for").

> ## 2.    *Rescinding the Event of Default*

U.S. Bank next argues that even assuming an automatic acceleration occurred, it is entitled to rescind this acceleration and decelerate the debt under Section 4.02(d) of the Indentures.[15]  U.S. Bank urges, as it did before the bankruptcy court, that Section 4.02(d) permits it to rescind the automatic acceleration so long as American is current on the principal and interest payments under the Notes (as well as other amounts owed otherwise than by virtue of the acceleration) and all other Events of Default have been waived.

---

[15] Section 4.02(d) of the Indentures provides:

> At any time after the Loan Trustee has declared the unpaid principal amount of all Equipment Notes then outstanding to be due and payable, or all Equipment Notes shall have become due and payable as provided in the proviso to Section 4.02(a)(i), and, in either case, prior to the sale of any part of the Collateral pursuant to this Article IV, a Majority in Interest of Noteholders, by written notice to the Company and the Loan Trustee, may rescind and annul such declaration . . . if: (i) there has been paid to or deposited with the Loan Trustee an amount sufficient to pay all overdue installments of principal amount of, and interest on, the Equipment Notes, and all other amounts owing under the Operative Documents, that have become due otherwise than by such declaration of acceleration and (ii) all other Events of Default, other than nonpayment of principal amount or interest on the Equipment Notes that have become due solely because of such acceleration, have been either cured or waived; provided that no such rescission or annulment shall extend to or affect any subsequent default or Event of Default or impair any right consequent thereon.

J.A. 148.  U.S. Bank also relies on Section 4.05, which provides that the Loan Trustee may waive past defaults upon written instructions from a majority in interest of the noteholders, after which "such default[s] shall cease to exist and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture."  J.A. 149.

Because American has remained current on its payments pursuant to its § 1110(a) elections, U.S. Bank argues that this option is contractually available and that by exercising it, U.S. Bank can require American to proceed in its refinancing pursuant to Section 2.11, which provides for the payment of a Make-Whole Amount.

To the extent this argument concerns U.S. Bank's contention that the bankruptcy court abused its discretion by declining to lift the automatic stay so that U.S. Bank may rescind acceleration or waive it, we more fully address that argument *infra*. As relevant here, suffice it to say that regardless whether U.S. Bank may theoretically rescind the acceleration pursuant to Section 4.02(d) of the Indentures (or waive Events of Default pursuant to Section 4.05) the bankruptcy court did not err in concluding that any attempt to do so would be an attempt to modify contract rights and would therefore be subject to the automatic stay that went into effect when American made its § 1110(a) elections. *In re AMR Corp.*, 485 B.R. at 294; *see In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) (noting that "contract rights are property of the estate . . . protected by the automatic stay" (internal quotation marks omitted)); *accord In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 431 (2d Cir. 1987) (holding that landlord's effort to terminate a prime tenant's lease violated automatic stay with respect to debtor's sublease).

As of the filing of its bankruptcy petition on November 29, 2011, American had the contractual right, pursuant to the Indentures, to repay its accelerated debt without Make-Whole Amount. We therefore agree with the bankruptcy court that any attempt by U.S. Bank to rescind acceleration now – after the automatic stay has taken effect – is an effort to affect American's contract rights, and thus the property of the estate. *See* 11 U.S.C. § 541(a)(1) (the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case"); *see also In re Albion Disposal, Inc.*, 217 B.R. 394, 407-08 (W.D.N.Y. 1997) ("[I]t is well-established . . . that a debtor's contractual rights – including rights arising under post-petition contracts – are included in the property of his estate."). As in *In re Solutia*, in which the bankruptcy court voided a notice from noteholders attempting to waive another automatic acceleration provision triggered by a bankruptcy filing in order to secure contractual payments not due in the event of acceleration, *see* 379 B.R. at 476-79, U.S. Bank's efforts here represent "a direct attempt to get more property from the debtor and the estate, either through a simple increase in the amount of a pro-rata plan distribution or through recovery of a greater amount of the collateral which secures the claim." *Id.* at 485; *see also In re Manville Forest Prods. Corp.*, 43 B.R. 293, 298 (Bankr. S.D.N.Y. 1984) ("Therefore . . . it . . . would have

29

violated the stay, for the long-term lenders to take overt steps to accelerate the debt without first seeking a modification of the stay from this Court."), *rev'd on other grounds by* 60 B.R. 403 (S.D.N.Y. 1986). In such circumstances, the bankruptcy court did not err in concluding that the automatic stay applies, preventing any such action by U.S. Bank without judicial intervention.

### 3.    *Post-Maturity Payment Not a Voluntary Redemption*

U.S. Bank argues, finally, that regardless whether American's November 2011 bankruptcy petition was an Event of Default triggering debt acceleration, American's effort in October 2012 to pay off its debt constitutes a Section 2.11 voluntary redemption for which Section 3.02 provides for payment of a Make-Whole Amount. The bankruptcy court rejected this argument, holding that the Debtors' proposed payment is a "post-maturity date repayment, not a prepayment," and that in such circumstances, Section 3.03's payment provisions, describing the order of priority for "all payments received . . . after both an Event of Default shall have occurred and be continuing and the Equipment Notes shall have become due and payable pursuant to Section 4.02(a)" is applicable. *In re AMR Corp.*, 485 B.R. at 298 (internal quotation marks and citation omitted). We agree.

As is already clear, American's bankruptcy petition triggered a default, and this default automatically accelerated the debt. That acceleration "change[d] the date of maturity from some point in the future . . . to an earlier date based on the debtor's default under the contract." *Analytical Surveys*, 684 F.3d at 44 (quoting *NML Capital*, 952 N.E.2d at 491). When the event of default occurred and the debt accelerated, the new maturity date for the debt was November 29, 2011. Consequently, American's attempt to repay the debt in October 2012 was not a voluntary prepayment because "[p]repayment can only occur *prior* to the maturity date." *In re Solutia*, 379 B.R. at 488. The soundness of this conclusion, moreover, is reinforced by the plain text of Section 3.02, the voluntary redemption payment schedule, which provides for potential payment of a Make-Whole Amount but itself states that it operates "*[e]xcept as otherwise provided in Section 3.03*" (emphasis added). Section 3.03 is the payment provision dealing specifically with payments in the context of a continuing Event of Default and debt acceleration.[16]

---

[16] U.S. Bank accords significance to the text of Section 2.11, which states that Equipment Notes "may be redeemed by the Company at *any time* upon at least 15 days' revocable prior written notice." J.A. 126 (emphasis added). But this general language carries less weight than the more specific terms contained in Sections 3.02 and 3.03. *See County of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001). The voluntary redemption schedule in Section 3.02 is subordinate to Section 3.03, which undermines U.S. Bank's argument that American's attempt to repay its debt after filing a bankruptcy petition can be deemed a voluntary prepayment under Section 3.02.

The case law dealing with similar automatic-acceleration-upon-bankruptcy clauses in indenture agreements supports this reading.[17]  *In re Solutia Inc.* involved notes held by the Bank of New York and governed by an indenture agreement.  379 B.R. at 476.  The agreement provided that filing for bankruptcy was an event of default under which the notes "shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder."  *Id.* at 478 (quoting the Indentures).  One of the noteholders' claims was for interest through the notes' stated maturity date despite the maturity date adjustment that occurred with automatic acceleration.  The court rejected the noteholders' claim for interest: "By incorporating a provision for automatic acceleration, the 2009 Noteholders made a decision to give up their future income stream in favor of having an immediate right to collect their entire debt.  Because the 2009 Notes were automatically accelerated, any payment at this time would not be a prepayment."  379 B.R. at 488.  The court also noted the possibility of "post-acceleration 'yield maintenance'" but found the indenture provisions did not

---

[17] We are not persuaded by U.S. Bank's attempts to distinguish these cases as involving "no call" provisions.  Both "[m]ake-whole and no-call provisions in bond indentures protect lenders' right to the yield that was expected at the time that they made their loans."  *In re Chemtura Corp.*, 439 B.R. 561, 596 (Bankr. S.D.N.Y. 2010).  Regardless which provision is employed, when the contract explicitly excludes their applicability upon automatic debt acceleration, the lender has no claim under either the no-call or the make-whole when the debtor attempts to pay off the accelerated debt.

provide for it.  *Id.*  U.S. Bank faces a similar dilemma.  *See also Calpine Corp.*, 2010 WL 3835200, at *4 (noting that although parties "could have provided for the payment of premiums in the event of payment pursuant to acceleration . . . [w]ithout such a provision . . . no damages are recoverable after acceleration").

Notwithstanding the clear language of the Indentures and applicable case law, U.S. Bank attempts to imbue ambiguity into the Indentures by highlighting isolated Indenture provisions, most notably the definition of "Make-Whole Amount" in the Indentures' Annex A.  This definition begins by stating:

> "<u>Make-Whole Amount</u>" means . . . the amount (as determined by an independent investment banker selected by the Company (and, following the occurrence and during the continuance of an Event of Default, reasonably acceptable to the Loan Trustee)) . . . .

J.A. 222.  U.S. Bank argues that the parenthetical's reference to a Make-Whole Amount to be determined "following the occurrence and during the continuance of an Event of Default" establishes that such an amount may be payable following an Event of Default and that this is inconsistent with American's claim that it owes no Make-Whole Amount pursuant to the plain language of both Sections 3.03 and 4.02(a)(i).  We are not persuaded.

33

Section 3.03, as previously noted, governs payments made by American after an Event of Default "shall have occurred and be continuing and the Equipment Notes shall have become due and payable pursuant to Section 4.02(a)" (providing for debt acceleration either at the option of the Loan Trustee upon the occurrence of some Events of Default or, in the context of a bankruptcy-related default such as the one specified in Section 4.01(g), automatically).  J.A. 135.  Section 3.03 expressly provides that "[n]o Make-Whole Amount shall be payable on [such] Equipment Notes as a consequence of or in connection with an Event of Default or the acceleration of the Equipment Notes."  J.A. 140.

U.S. Bank is correct that there are scenarios pursuant to the plain terms of the Indentures in which an Event of Default could occur and continue and a Make-Whole Amount would be due.  Thus, one can postulate an Event of Default under Section 4.01(c) (such as failure to carry insurance), after which the Loan Trustee does not elect to remedy the default, the failure to carry insurance continues, and then six months later, the Debtor attempts to pay off all outstanding – and nonaccelerated – principal.  Such an attempt would likely qualify as a voluntary redemption and a Make-Whole Amount would be owed pursuant to Section 3.02.  (Section 3.03 would not be triggered, because it applies only when an Event of Default occurs, continues,

*and the debt is accelerated*.)  Thus, contrary to U.S. Bank's assertions, the Make-Whole Amount definition's parenthetical is not rendered "meaningless" by affording Section 3.03 its plain meaning.  For while in some scenarios American might owe a Make-Whole Amount in connection with a voluntary redemption during the persistence of an Event of Default, this is simply not true regarding the scenario here.

U.S Bank argues, next, that Section 3.03, by its terms, only excludes payment of a Make-Whole Amount "as a consequence of or in connection with an Event of Default or the acceleration of the Equipment Notes," and that the post-maturity repayment that American now attempts is not, in fact, "a consequence of or in connection with" either its bankruptcy filing or debt acceleration but is, instead, an attempt to take advantage of low interest rates.  We need not parse the meanings of "consequence" or "connection" to reject U.S. Bank's interpretation.   U.S. Bank again focuses on isolated phrases in the Indentures.  Given Section 4.02(a)(i)'s directive that debt acceleration upon a voluntary bankruptcy filing is automatic and that in this circumstance the debt owed is "for the avoidance of doubt, *without Make-Whole Amount*" (emphasis added), Section 3.03 must clearly be read to exclude the payment of any Make-Whole Amount where an Event of Default

has occurred, is continuing, and debt acceleration has taken place – precisely the circumstance here.

In conclusion, as of November 29, 2011 and as a matter of contract, American owed the entire accelerated debt of principal and interest but no Make-Whole Amount. Because we find the relevant language of the Indentures to be unambiguous, moreover, we reject U.S. Bank's alternative argument to the effect that discovery should have been undertaken as to the proper interpretation of the disputed provisions.

## II. Ipso Facto *Clauses and 11 U.S.C. § 365(e)(1)*

U.S. Bank next argues that even assuming the preceding interpretation of the Indentures is correct (that American's bankruptcy filing was an Event of Default pursuant to Section 4.01(g) that automatically triggered debt acceleration in accord with Section 4.02(a)(i)), default and automatic acceleration provisions of this sort – *ipso facto* provisions "modify[ing] the relationships of contracting parties due to the filing of a bankruptcy petition," *In re Chateaugay Corp.*, 1993 U.S. Dist. LEXIS 6130, at *14 (S.D.N.Y. May 10, 1993) – are "broadly unenforceable" under the Bankruptcy Code. U.S. Bank is correct that Sections 4.01(g) and 4.02(a)(i) are indeed *ipso facto* clauses. *See In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 414 (Bankr. S.D.N.Y. 2010) (defining *ipso facto* clauses as clauses within a contract that

36

"seek to modify the relationships of contracting parties due to the filing of a bankruptcy petition"). But its argument that the Code categorically prohibits enforcement of such clauses – and that these clauses, in particular, are unenforceable – is without merit.

U.S. Bank relies on three provisions in the Bankruptcy Code that decline enforcement of *ipso facto* clauses in specified circumstances. First is § 365(e)(1) of the Code, which provides in relevant part as follows:

> Notwithstanding a provision in an executory contract or unexpired lease . . . an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—
>> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
>> (B) the commencement of a case under this title; or
>> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1). By its terms, § 365(e)(1) is inapplicable here. Both parties agree that the Indentures are not executory contracts – contracts "on which performance remains due to some extent on both sides," *In re Penn Traffic Co.*, 524 F.3d 373, 379 (2d Cir. 2008) (quoting *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984)); *see also* Vernon Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973)

(defining executory contract as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other"), and neither argues that this case involves an unexpired lease.  The bankruptcy court therefore did not err in concluding that "Section 4.02(a)(i) is not an invalid *ipso facto* clause" pursuant to this provision. *In re AMR Corp.*, 485 B.R. at 297.

The two remaining provisions, § 541(c)(1)(B) and § 363(*l*), are similarly inapposite.  Section 541(c)(1)(B) provides that once a bankruptcy case is commenced, any property interests of the debtor become property of the bankruptcy estate, notwithstanding any *ipso facto* clause that "effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." *See id.* ("[A]n interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement" that is "conditioned on the insolvency or financial condition of the debtor" or on the commencement of a bankruptcy case "and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property").  But Sections 4.01(g) and 4.02(a)(i) do not prevent property of American from becoming property of the estate.  Finally, § 363 of the Code gives the bankruptcy trustee general powers to use, sell, or

lease property of the estate, *see id*. § 363(b), (c), and § 363(*l*) makes clear that the trustee has such powers, notwithstanding any *ipso facto* clause, *see id*. § 363(*l*) ("Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section . . . notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor" or the commencement of a bankruptcy case "and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property"). The Indenture clauses at issue here, however, do not prevent the bankruptcy trustee from using, selling, or leasing estate property, and so do not fall within § 363(*l*)'s terms.

U.S. Bank argues that these statutory provisions "broadly prohibit the enforcement" of *ipso facto* clauses, and apparently regardless whether they by their terms apply. The Appellant cannot identify any provision of the Bankruptcy Code, however, that provides support for such a *per se* prohibition. Moreover, the specificity of the provisions on which U.S. Bank *does* rely – which demonstrate that Congress clearly knows how to limit or negate the effect of *ipso facto* clauses when it wants to – counsels against the position that U.S. Bank urges here. As in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co*., 549 U.S. 443, 452 (2007), "[t]he absence

39

of textual support is fatal" to U.S. Bank's position that *ipso facto* provisions are broadly or categorically denied enforcement by the Code. The bankruptcy court did not err in rejecting this argument.

### III. 11 U.S.C. § 1110(a) Elections

U.S. Bank's penultimate arguments on appeal concern 11 U.S.C. § 1110(a) and American's December 2011 and January 2012 elections committing the Debtors "to perform all obligations . . . under the [Indentures] with respect to the Aircraft Equipment" and to cure any default (other than a default "of a kind specified in section 365(b)(2) of the Bankruptcy Code"). Section 1110(a)(1) provides generally that creditors with a secured interest in aircraft or related equipment may repossess their collateral or enforce other rights under a "security agreement, lease, or conditional sales contract" with the debtor notwithstanding, *inter alia*, § 362's automatic stay.[18]  As we have

---

[18] 11 U.S.C. § 1110(a)(1) provides as follows:

> Except as provided in paragraph (2) and subject to subsection (b), the right of a secured party with a security interest in equipment described in paragraph (3), or of a lessor or conditional vendor of such equipment, to take possession of such equipment in compliance with a security agreement, lease, or conditional sale contract, and to enforce any of its other rights or remedies, under such security agreement, lease, or conditional sale contract, to sell, lease, or otherwise retain or dispose of such equipment, is not limited or otherwise affected by any other provision of this title or by any power of the court.

As set forth *infra*, paragraph (2) of § 1110(a), referenced in § 1110(a)(1), provides a means by which a debtor may secure the protection of the automatic stay notwithstanding § 1110(a)(1). Section 1110(b) specifies circumstances in which the

40

said, Congress in § 1110(a) "intend[ed] to extend extraordinary protection to financiers of aircraft," providing them heightened ability to protect their collateral in bankruptcy proceedings, "in order to encourage investment in new equipment for air carriers." *In re Air Vt., Inc.*, 761 F.2d 130, 132 (2d Cir. 1985); *see also In re Trans World Airlines,* 145 F.3d 124, 137 (3d Cir. 1998) ("Section 1110 was designed in part to increase availability of low-interest capital to the transportation industry.").  At the same time, pursuant to § 1110(a)(2), a debtor like American may secure the protection of the automatic stay (preventing, *inter alia*, repossession of its equipment) if within 60 days of a bankruptcy filing it: (1) agrees to perform "all obligations of the debtor" pursuant to its agreement with the secured creditor; and (2) it cures any default not "of a kind specified in section 365(b)(2)" within a defined period.[19]  Section 1110(a) elections of the sort American made here

---

time period in which the debtor must act pursuant to § 1110(a)(2) may be extended, and is not relevant to this appeal.

[19] As the bankruptcy court noted, § 1110(a)(2) refers to the trustee, not the debtor, but the trustee in this case, as in most cases under Chapter 11, is the debtor-in-possession.  *In re AMR*, 485 B.R. at 305 n.26.  Section 1110(a)(2) provides as follows:

> The right to take possession and to enforce the other rights and remedies described in paragraph (1) shall be subject to section 362 if—

> (A) before the date that is 60 days after the date of the order for relief under this chapter, the trustee, subject to the approval of the court, agrees to perform all obligations of the debtor under such security agreement, lease, or conditional sale contract; and

"require[ ] court approval but not the [secured creditor's] consent." *In re Trans World Airlines*, 145 F.3d at 137.

U.S. Bank makes three arguments regarding § 1110.  First, U.S. Bank argues that the Debtors' election to "perform all obligations" under the Indentures pursuant to § 1110(a)(2) requires the Debtors to abide by *all* the terms of the Indentures, including the requirement to pay the Make-Whole Amount.  Second, U.S. Bank argues that assuming the Notes were accelerated pursuant to Section 4.02(a)(i) of the Indentures upon American's bankruptcy filing (so that no Make-Whole Amount need be paid upon their post-maturity repayment) American's § 1110(a) elections and regular payments of principal and interest pursuant to these elections had the effect of decelerating the Notes.  Finally, U.S. Bank argues that if the Notes were accelerated and American's § 1110(a) elections did *not* decelerate them, then

---

(B) any default, other than a default of a kind specified in section 365(b)(2), under such security agreement, lease, or conditional sale contract—

  (i) that occurs before the date of the order is cured before the expiration of such 60-day period;

  (ii) that occurs after the date of the order and before the expiration of such 60-day period is cured before the later of—

   (I) the date that is 30 days after the date of the default; or

   (II) the expiration of such 60-day period; and

  (iii) that occurs on or after the expiration of such 60-day period is cured in compliance with the terms of such security agreement, lease, or conditional sale contract, if a cure is permitted under that agreement, lease, or contract.

American has not cured its defaults as required by § 1110(a)(2) because since it entered into its elections, American has remitted only principal and interest payments but not the accelerated amount.  Accordingly, says U.S. Bank, American is not (and never was) entitled to the protection of the automatic stay.  For the following reasons, we are not persuaded.

### 1. Section 1110(a)(2) Does Not Require Assumption of the Indentures

U.S. Bank's first argument – that American's commitment in its § 1110(a)(2) elections to "perform all obligations" under the Indentures requires it to pay a Make-Whole Amount – is but a reprise of its arguments pursuant to the Indentures themselves, and it fails for the same reason.  U.S. Bank is correct that in order to maintain the protection of the automatic stay, American is required pursuant to § 1110(a)(2)(A) to perform its obligations under the Indentures, with the exception that it need not cure defaults "of a kind specified in section 365(b)(2)."  11 U.S.C. § 1110(a)(2).  But contrary to U.S. Bank's claim, American's commitment "to perform all obligations" under the Indentures while the automatic stay remains in effect does not obligate it to pay a Make-Whole Amount pursuant to Section 3.02.  American's debt was accelerated pursuant to Section 4.02(a)(i) upon its bankruptcy filing and American is not now voluntarily redeeming the notes, but attempting to

43

effect a post-maturity date repayment.  No Make-Whole Amount is now or has ever been due pursuant to the Indentures.

U.S. Bank's second argument is, in effect, a response to the preceding point: U.S. Bank argues that American *is* attempting a voluntary redemption (and so owes a Make-Whole Amount) because American's § 1110(a) elections themselves decelerated its debt, returning it to its pre-bankruptcy filing position.  U.S. Bank cites no pertinent authority for this proposition, however, and for a simple reason: there isn't any.  Section 1110(a)(2) does not modify the parties' contractual relationship or commit the debtor to an assumption of any such modified relationship, but simply provides a mechanism by which an airline can gain the protection of the automatic stay notwithstanding § 1110(a)(1).[20]  Thus, American's elections, for the period it complies with them, merely establish an interim arrangement in bankruptcy pursuant to which it is entitled to the benefit of the automatic stay.  The

---

[20] The text of Section 1110(a) makes this clear enough, but it is also confirmed in relevant case law.  *See, e.g.*, *In re Trans World Airlines*, 145 F.3d at 137 ("A § 1110 agreement . . . operates neither as an assumption nor as a rejection of the entire lease . . . [and] after the § 1110 agreement is made, the debtor remains free to make a formal assumption or rejection of the lease and, until that time or such time as the § 1110 agreement is breached or terminated, the automatic stay of § 362 remains in effect."); *In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1508 (11th Cir. 1985) (noting that "the debtor upon entering into a section 1110 stipulation does not assume and is not ultimately liable for performance of the contract"); *In re Enron Corp.*, 300 B.R. 201, 213 (Bankr. S.D.N.Y. 2003) ("A debtor's decision to elect to receive benefits under a contract post-petition does not translate into an obligation to assume the contract, because a debtor cannot assume a contract by implication.").

bankruptcy court therefore correctly determined that American's § 1110(a) elections and its payments pursuant to these elections did not alter American's ability to repay the accelerated debt pursuant to the terms of the Indentures. *In re AMR Corp.*, 485 B.R. at 307.

### 2. *Section 1110(a)(2) Does Not Require Cure of a Bankruptcy Default*

That brings us to U.S. Bank's third and final argument pursuant to § 1110(a): that if the debt was accelerated under Section 4.02(a)(i) and if American's § 1110(a)(2) elections did not decelerate this debt, returning the parties to their pre-bankruptcy position, then American has failed to cure its default as to this accelerated debt by paying it off and thus is not (and never was) entitled to the protection of the automatic stay. According to U.S. Bank, when American made its § 1110(a) elections in December 2011 and January 2012, it promised, as the statute requires, to perform all obligations under the Indentures and to cure any default other than a default of a kind specified in § 365(b)(2). But assuming American's entire debt was due and payable at that time, U.S. Bank asserts that American did not and has not subsequently cured this default by paying it off. Accordingly, American was never entitled to the protection of the automatic stay. Its secured creditors should therefore be declared free to exercise whatever rights and remedies the Indentures afford to them (including, presumably, the right to rescind

acceleration pursuant to Section 4.02(d) or to waive default as to acceleration and thus to require payment of a Make-Whole Amount in connection with American's refinancing).

We note that U.S. Bank did not object to American's § 1110 notices in December 2011 and January 2012 on the ground that American had not and was not intending to pay the full accelerated debt, even though each such notice makes clear that American proposed to pay only regularly scheduled principal and interest payments in availing itself of § 1110(a)(2). In October 2012, when American moved before the bankruptcy court to effect its post-petition refinancing, moreover, U.S. Bank did not argue that the § 1110(a)(2) elections were invalid from the start by virtue of American's failure to pay back the full accelerated amount, but instead acknowledged that "Section 1110 permitted the Debtors to make the 1110(a) Agreement and to perform under the Aircraft Agreements, *including by making regularly scheduled payments of principal and interest*, as if the bankruptcy Event of Default under Section 4.01(g) of the Indenture had never occurred." (emphasis added).[21]  The instant argument was eventually made before the bankruptcy

---

[21] The objection filed in connection with the EETC Indentures similarly noted that "[t]he only existing default under the Prepetition Notes Indentures is the '*ipso facto*' default arising under Section 4.01(g) thereof as a result of the commencement of these chapter 11 cases, and that default is rendered unenforceable by section 1110(a)(2)(B)."

court in November 2012.  But this was after U.S. Bank had already accepted

payments of principal and interest from American in February and August

2012.

At any rate (and however U.S. Bank's position may have shifted below)

we conclude that U.S. Bank's argument fails on the merits.  Turning again to

the text of § 1110(a)(2)(A), a debtor need not cure a default "of a kind

specified in 11 U.S.C. § 365(b)(2)" in order to obtain the benefit of the

automatic stay.  A § 365(b)(2) default in turn is:

> [A] default that is a breach of a provision relating to–
> (A) the insolvency or financial condition of the debtor at
> any time before the closing of the case;
> (B) the commencement of a case under this title;
> (C) the appointment of or taking possession by a trustee in
> a case under this title or a custodian before such
> commencement; or
> (D) the satisfaction of any penalty rate or penalty provision
> relating to a default arising from any failure by the debtor
> to perform nonmonetary obligations under the executory
> contract or unexpired lease.

11 U.S.C. § 365(b)(2).[22]  Thus, American was not required to pay off its

accelerated debt to obtain the benefit of the automatic stay pursuant to

---

[22] Section 365(b)(2) is part of a Code provision dealing with executory contracts and
unexpired leases.  Paragraph (1) of § 365(b) sets forth conditions (such as cure of
outstanding defaults) that the bankruptcy trustee must satisfy before assuming an
executory contract or unexpired lease pursuant to which there has been a default,
while § 365(b)(2), set forth in relevant part here, describes defaults to which
Paragraph (1) is inapplicable.

§ 1110(a)(2) if the failure to do so is a default "of a kind specified in" § 365(b)(2). We conclude that it is.

Section 365(b)(2) concerns itself, broadly, with "contract provisions that force debtors into default merely for becoming insolvent or seeking bankruptcy protection" or that impose penalties for defaults which are "often a product of the debtor's very financial distress." *In re BankVest Capital Corp.*, 360 F.3d 291, 301 (1st Cir. 2004); *see also In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000). It explicitly lists among the defaults with which it is concerned "a default that is a breach of a provision relating to . . . the commencement of a [bankruptcy] case." 11 U.S.C. § 365(b)(2)(B). As is by now clear, the default that triggered the acceleration of American's debt was its breach of Section 4.01(g) of the Indentures, which defines an "Event of Default" as occurring when "the Company shall file a voluntary petition in bankruptcy or a voluntary petition . . . seeking reorganization, liquidation or other relief as a debtor." And debt acceleration, pursuant to Section 4.02(a)(i), followed automatically from this bankruptcy default.

We conclude that American was not required to pay off the accelerated debt to gain the protection of the automatic stay. The default of this obligation was "of a kind specified in section 365(b)(2)" – namely, the breach of a provision relating to the commencement of a bankruptcy case. 11 U.S.C.

§ 1110(a)(2)(B).   Section 1110(a)(2)(B) does not negate such defaults, but it does permit the debtor to postpone their consequences – as U.S. Bank noted in one of its October 2012 filings: "to make the 1110(a) Agreement and to perform under the Aircraft Agreements, including by making regularly scheduled payments of principal and interest, as if the bankruptcy Event of Default under Section 4.01(g) of the Indenture *had never occurred*." For the period in which American sought protection of the automatic stay, it was obligated to make its scheduled principal and interest payments in order to obtain the benefit of the automatic stay, but not to pay off the accelerated debt, due only as a result of its bankruptcy filing.  *See In re Trans World Airlines,* 145 F.3d at 138 (noting that under 11 U.S.C. § 1110(a), a debtor must perform "according to pre-bankruptcy terms" (emphasis omitted)); *In re Airlift Int'l*, 761 F.2d at 1513 (noting that "Congress defined the adequate protection necessary [for creditors] to be the guarantee of installment payments under the note or lease for as long as the debtor retains possession of the aircraft").

Accordingly, we hold that under the terms of § 1110(a)(2) and American's § 1110(a) elections, American did not have to cure its Section 4.01(g) default or pay off the automatically accelerated debt triggered by its bankruptcy filing to obtain the protection of the automatic stay.  American's

payments of principal and interest to U.S. Bank in February and August 2012 were thus in compliance with its § 1110(a)(2) obligations.  And because a § 1110(a)(2) election does not modify the parties' contract or constitute the debtor's assumption of the contract, but merely sets forth conditions pursuant to which the debtor may obtain the benefit of the automatic stay, American's subsequent application in October 2012 to repay its still-accelerated debt (and thus end the period in which the automatic stay would apply) did not in any way contravene § 1110(a).  U.S. Bank's arguments to the contrary are without merit.

*IV.*

Finally, U.S. Bank argues that the bankruptcy court erred in denying its motion to lift the automatic stay.  U.S. Bank argues that if American's debt is accelerated and if its § 1110(a) elections are proper but did not have the effect of themselves decelerating the debt, the automatic stay should be lifted so that U.S. Bank may waive American's Section 4.01(g) default and decelerate the debt.  The court's decision denying U.S. Bank's motion is reviewable only for an abuse of discretion.  *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999).

Our Court has referenced twelve factors in considering the propriety of lifting the automatic stay, recognizing that not all of these factors will be

relevant in all cases. *See In re Bogdanovich*, 292 F.3d 104, 110 (2d Cir. 2002) (citing *In re Sonnax Indus.*, 907 F.2d 1280, 1285-86 (2d Cir. 1990)). The bankruptcy court generally found relevant factor two, relating to the impact of lifting the stay on the bankruptcy case, and factor twelve, concerning the impact of the stay on the parties and the balance of harms. *In re AMR Corp.*, 485 B.R. at 295.

We find no abuse of discretion in the bankruptcy court's conclusion that lifting the automatic stay would serve only to increase the size of U.S. Bank's claim (to an amount greater than that to which it is entitled pursuant to the Indentures), harming the estate and American's other creditors.[23] "One of the principal purposes of the automatic stay is to preserve the property of the debtor's estate for the benefit of all the creditors." *In re Prudential Lines Inc.*, 928 F.2d 565, 573 (2d Cir. 1991). We conclude that the bankruptcy court did not abuse its discretion in denying U.S. Bank's motion to lift the automatic stay.

---

[23] We do not reach the bankruptcy court's brief discussion of U.S. Bank's bringing its motion for the first time over a year after American declared bankruptcy. *See In re AMR Corp.*, 485 B.R. at 295.

## CONCLUSION

To summarize, we conclude that:

(1)     Under the language of the Indentures, American's voluntary petition for bankruptcy triggered a default and automatically accelerated the debt, the satisfaction of which requires no make-whole payment;

(2)     *ipso facto* clauses in a nonexecutory contract are not unenforceable pursuant to 11 U.S.C. § 365(e) or any other Bankruptcy Code provision identified by U.S. Bank;

(3)     American complied with its 11 U.S.C. § 1110(a) elections to perform its obligations under the Indentures and cure any non-exempt defaults by making regularly scheduled principal and interest payments; it was not required to cure its Section 4.01(g) default; and

(4)     the bankruptcy court did not abuse its discretion in denying U.S. Bank's motion to lift the automatic stay.

Accordingly, the judgment of the bankruptcy court is AFFIRMED.